UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| ALL YEAR HOLDINGS LIMITED, | ) | |
| | ) | Case No. 24-00800-JHR |
| Debtor, | ) | Bankruptcy Case No. 21-12051 (MG) |
| _____ | ) | |
| | ) | |
| AYH WIND DOWN LLC, THROUGH OFER | ) | |
| TZUR AND AMIR FLAMER, SOLELY IN THEIR | ) | |
| JOINT CAPACITY AS CLAIMS | ) | |
| ADMINISTRATOR, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 23-01180-mg |
| | ) | |
| YOEL SILBERSTEIN, | ) | |
| | ) | |
| Defendant. | ) | |


**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AND COMPEL ARBITRATION**

TABLE OF CONTENTS

SECTION                                          HEADING                                          PAGE

INTRODUCTION .................................................................................................1

BACKGROUND .................................................................................................2

    I.    The Bankruptcy Case ...................................................................2

    II.   The Adversary Proceeding Thus Far ..........................................3

ARGUMENT .....................................................................................................6

    I.    Defendant's Motion to Withdraw the Reference Should Be Denied ...........6

        A.    The Motion Is Untimely ..............................................6

        B.    Cause Does Not Exist to Withdraw the Reference .......................7

            i.    Core Claims Are Likely to be Introduced into the Adversary Proceeding Following Deposition Testimony ......................................8

            ii.   The Other Orion Factors Weigh in Favor of Keeping This Adversary Proceeding with the Bankruptcy Court ...............................11

    II.   Defendant's Motion to Compel Arbitration Should Be Denied ..................14

        A.    The 2015 Agreement's Arbitration Clause Does Not Apply to the Adversary Proceeding ...........................................14

        B.    There Are Questions of Material Fact Surrounding the Formation of the Arbitration Agreement .................................17

            i.    Defendant Waived His Right to Arbitrate By Sitting on His Rights ...18

CONCLUSION ...................................................................................................20

TABLE OF AUTHORITIES

PAGE

## Cases

*Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21CV10377ATKHP, 2022 WL 987665 (S.D.N.Y. Apr. 1, 2022)..................................................................................................................................13

*AYH Wind Down LLC. v. Alexander Engelman*, Case No. 23-AP-01196 (B.K. S.D.N.Y.) .....3, 12

*Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 2018 WL 6618389 (S.D.N.Y. Dec. 18, 2018)...................................................................................................................................17

*GateGuard, Inc. v. Goldenberg*, 585 F. Supp. 3d 391 (S.D.N.Y. 2022).......................................13

*In re Chateaugay Corp.*, 104 B.R. 622 (S.D.N.Y. 1989) .................................................................6

*In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993) ...............................................8, 10, 11, 12

*In re Residential Cap., LLC*, 527 B.R. 865 (S.D.N.Y. 2014)..................................................8, 11

*In re Try The World, Inc.*, No. 18-11764-JLG, 2021 WL 3502607 (Bankr. S.D.N.Y. Aug. 9, 2021)....................................................................................................................................9

*Johnson v. S.A.I.L. LLC (In re Johnson)*, 649 B.R. 735 (Bankr. N.D. Ill. 2023) ......................18

*Kentile Floors v. Congoleum Corp. (In re Kentile Floors )*, Adv. No. 94-8518A, No. 95 Civ. 2470, 1995 WL 479512 (S.D.N.Y. Aug.10, 1995) .................................................................6

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20 (2d Cir. 1995) .................18

*Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156 (2d Cir. 2010) ...............................................................................................................17

*Manigault v. Macy's East, LLC*, 318 F. App'x 6 (2d Cir. 2009)...................................................13

*N. Boulevard Automall*, 2022 WL 5184729 (E.D.N.Y. Oct. 5, 2022) ........................................12

*O'Neill v. New England Rd., Inc.*, No. 3:99MC309(SRU), 2000 WL 435507 (D. Conn. Feb. 28, 2000)...................................................................................................................................10

*Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Transp. Corp. (In re FMI Forwarding Co.)*, No. 04 Civ. 630, 2005 WL 147298 (S.D.N.Y. Jan. 24, 2005)..........6, 7

*Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102 (2d Cir. 2002) ..............................17

*Whitehaven S.F., LLC v. Spangler*, 633 F. App'x 544 (2d Cir. 2015) .........................................13

## Statutes

11 U.S.C. § 548 .......................................................................................................................8, 9

28 U.S.C. § 157 ...................................................................................................................6, 8, 9

## INTRODUCTION

Defendant's Motion to Withdraw the Reference and Compel Arbitration (the *"Motion"*) is a meritless attempt to delay and frustrate Plaintiff's claim against him for over $6 million under a straightforward promissory note.  Both the request to withdraw the reference and the request for arbitration are not only groundless but were only brought after Defendant had stonewalled discovery for as long as he could in the underlying adversary proceeding.  Every single fact and argument in the Motion was available to Defendant at the outset of this lawsuit six months ago, in September 2023.  Yet Defendant waited months to bring these arguments, and did so only when it was clear he would have to sit for a deposition.  Apart from the timing deficiencies, which are on their own sufficient grounds to deny each request, both motions also fail on the merits.  None of the factors the Court must weigh in determining whether the Bankruptcy Court is the most administratively efficient and uniform forum weigh in favor of withdrawing the reference, and in such cases courts have routinely left the Bankruptcy Court to its work.  As for the motion to compel, it is based on a clearly inapplicable arbitration agreement that, by its terms, is limited to disputes concerning four investment properties.  There are also significant questions of fact regarding the formation of that arbitration agreement between Defendant and the Debtor based on Defendant's own deposition testimony that he was never actually dealing with the Debtor, only Yoel Goldman personally. The motions are thus untimely and ill-founded and should be denied.

The Court should instead permit the Bankruptcy Court to complete its thus far effective and efficient administration of this proceeding alongside the other similar adversary claims and the ongoing, long, and complex bankruptcy proceeding for which it is the most well-suited and appropriate forum.

**BACKGROUND**

**I.     THE BANKRUPTCY CASE**

On December 14, 2021 (the *"Petition Date"*), the Debtor filed a voluntary bankruptcy petition under chapter 11 of title 11 of the United States Bankruptcy Code (the *"Bankruptcy Code"*), which initiated the above-captioned Bankruptcy Case No. 21-12051 (MG) (the *"Main Case"*).  Prior to the effectiveness of its plan of reorganization the Debtor was a British Virgin Islands real estate development holding company whose portfolio included approximately 1,648 residential units and 69 commercial units mainly located in Brooklyn, New York, which had, on the petition date, an aggregate net book value of over a billion dollars.  Declaration of Assaf Ravid, Main Case ECF No. 4 at ¶ 6.  As of the Petition Date, the Debtor had approximately $1.6 billion in outstanding funded debt obligations comprised of approximately $800 million in bonds and $760 million in property-level mortgage debt.  *Id.*

The Debtor was founded on September 17, 2014 by its sole shareholder, Mr. Yoel Goldman (*"Mr. Goldman"*), who was the manager of the Debtor's business operations until shortly before the petition was filed.  *Id.* at 6. Mr. Goldman's conduct and operation of the Debtor was and remains a source of tension, as he had, prior to the Petition Date, previously taken control of the Debtor's Board of Directors and authorized payments satisfying obligations of the Debtor he had also personally guaranteed.  *Id.* at ¶ 10.  During the course of the Main Case, the Debtor has issued and pursued several subpoenas under Bankruptcy Rule 2004 aimed at further investigating Mr. Goldman's direction and control over the Debtor's assets leading up to the Debtor's chapter 11 petition, including a subpoena to Mr. Goldman himself.  *See* Main Case ECF No. 441, 443 (application and order authorizing Rule 2004 subpoenas).

On January 31, 2023, following extensive and complex negotiations, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law, and Order (the *"Confirmation Order"*) (Main Case ECF No. 352) confirming the Third Amended Chapter 11 Plan of Reorganization

-2-

(the *"Plan"*) (Main Case ECF No. 289).   Paragraph 27 of the Confirmation Order specifically includes the Bankruptcy Court's retention of jurisdiction over "any rights, Claims, or Causes of Action held by or accruing to the Debtor, the Reorganized Debtor, the Plan Administrator, or Wind-Down Co[.]" Confirmation Order ¶ 27.   As part of the Debtor's reorganization, the Plan transferred certain of the Debtor's legal claims to AYH Wind Down LLC, for the purpose of recovering additional property for distribution to creditors.   Main Case ECF No. 289.   Under the Plan Administration Agreement, which was executed in conjunction with the effectiveness of the Plan, Ofer Tzur and Amir Flamer were jointly appointed "Claims Administrator" for the purposes of administering and managing AYH Wind Down LLC's prosecution of the Debtor's claims.   The Plan Administration Agreement further vests in the Claims Administrator complete authority to "control and exercise authority over the Avoidance Actions and Causes Action vested in Wind-Down Co pursuant to the Plan, and over the litigation, management and disposition thereof." Accordingly, on the Effective Date of the Plan, the Debtor's claims against third parties generally became the property of AYH Wind Down LLC, as administered by the Claims Administrator. This adversary case (the *"Adversary Proceeding"*) is one of those claims formerly belonging to the Debtor.[1]

## II.   THE ADVERSARY PROCEEDING THUS FAR

Plaintiff initiated this Adversary Proceeding for a single breach of contract count against Defendant Yoel Silberstein (*"Defendant"*) on September 19, 2023.   The Adversary Complaint alleges that on March 21, 2018, Mr. Silberstein executed a promissory note (the *"Note"*) in favor of the Debtor in the original principal amount of $3,350,000 that he failed to repay, which

---

[1]     Plaintiff's claim is analogous to that of a liquidating trustee.  *See, e.g.*, *In re Residential Capital, LLC*, 519 B.R. at 600 ("The confirmed plan of liquidation expressly preserves RFC's claims and transfers them to the liquidating trust to prosecute . . . RFC's claims in this action are such transferred claims, and any funds recovered will be distributed to the creditors of the estate.").

obligation grew to what is now alleged to be no less than $6,321,822.22. *See generally* Adv. Pro. ECF No. 1 (Adversary Complaint).

Defendant filed his Answer on October 20, 2023. Adv. Pro. ECF No. 10. The Bankruptcy Court then entered a Case Management Order following an initial status conference on October 31, 2023. Adv. Pro. ECF No. 11. The parties thereafter exchanged Initial Disclosures on November 14, 2023. Declaration of Eric Silvestri (*"Silvestri Decl."*) ¶ 3.

Defendant's Initial Disclosures contained photographs of two hand-written documents that were purportedly translated from Hebrew. Silvestri Decl. ¶ 4. The first, which is Exhibit N to the Declaration of Paul Aloe in support of the Motion (ECF No. 3-1 at pp. 229–236), is dated November 23, 2015 (the *"2015 Agreement"*). ECF No. 3-1 at p. 236. Purportedly signed by both Defendant and Mr. Goldman, the 2015 Agreement concerns various claims and cross-claims among the two men related to three real estate development projects which were known to them as "41-21 28th Street", "The North Flats", and "Albee Square." ECF No. 3-1 at p. 229–230. Included in the 2015 Agreement, which predates the Note by nearly three years, is what appears to be an arbitration clause, which forms the sole basis for Defendant's motion to compel arbitration. ECF No. 3-1 at p. 235.

The second document produced in Defendant's Initial Disclosures, which is Exhibit O to the Declaration of Paul Aloe (ECF No. 3-1 at pp. 241–243), was an agreement purportedly signed by Defendant and Mr. Goldman dated October 1, 2020 (the *"2020 Agreement"*). October 1, 2020 is mere weeks from when the Debtor would announce it was unable to pay its obligations on $800 million in bonds. The 2020 Agreement purportedly "releases" Mr. Silberstein from his obligations under the Note. This "release" has emerged as essentially Mr. Silberstein's only defense against what is otherwise a clear contractual obligation to repay the Note.

Following Initial Disclosures, Plaintiff served discovery requests on Defendant on December 4, 2023. Silvestri Decl. ¶ 6. Defendant responded to those Document Requests on January 18, 2024 indicating he had no documents to produce beyond what was previously delivered in his Initial Disclosures. Silvestri Decl. ¶ 7. Plaintiff then accordingly requested dates to schedule Defendant's deposition on January 24, 2024. Silvestri Decl. ¶ 8. Rather than providing his availability, Defendant filed the Motion on February 2, 2024. ECF Nos. 1–4. Defendant did not move to stay the Adversary Proceeding pending the Motion. Accordingly, at a status hearing before the Bankruptcy Court, Chief Judge Glenn ordered Defendant to immediately provide dates for his deposition and for discovery to continue apace. Silvestri Decl. ¶ 9. On February 8, 2024, Defendant made a document production of approximately 666 documents, and on February 19, 2024, Plaintiff took Defendant's deposition testimony. Silvestri Decl. ¶ 10.

Defendant's deposition testimony illuminated his close personal friendship and long-standing business relationship with Mr. Goldman, which apparently included routine transfers of large amounts of money between the two men without any written agreements or documentation. Excerpts of Defendant's deposition transcript are attached to the Declaration of Eric Silvestri submitted contemporaneously herewith. Defendant further testified that he and friend Goldman engineered a sham transaction in which the Note would never actually be repaid and that the $3,350,000 that flowed to Defendant in March 2018 was essentially a payoff for claims Silberstein had against Goldman related to their real estate work in 2012 and 2013. Silberstein Dep. 77–78. The October 1, 2020 "release," therefore, further papered over the fraudulent transaction by purporting to excuse Defendant from obligations he never considered legitimate in the first place.

Defendant's testimony prompted Plaintiff to immediately seek an extension from the Bankruptcy Court for time to file a motion to amend its Adversary Complaint to include fraudulent transfer claims. Adv. Pro. ECF No. 17. Plaintiff has now sought and anticipates conducting a

deposition of Mr. Goldman to further explore Defendant's claims that the Note was an organized fraud designed to syphon money to Defendant in payment of Mr. Goldman's obligations to him. Silvestri Decl. ¶ 11. Discovery closes on April 9, 2024. Adv. Pro. ECF No. 18. It is within the context of these factual revelations and procedural posture that the Motion arrives before this Court, which must now determine whether the Bankruptcy Court is the most efficient and uniform forum for this dispute.

**ARGUMENT**

**I.     DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE SHOULD BE DENIED**

Under 28 U.S.C. § 157, a District Court may withdraw the reference to the Bankruptcy Court on its own motion or on timely motion of any party for cause shown.  *Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Transp. Corp. (In re FMI Forwarding Co.)*, No. 04 Civ. 630, 2005 WL 147298, at *5 (S.D.N.Y. Jan. 24, 2005).   Thus, Defendant must demonstrate two things to prevail: (1) he must demonstrate his motion was timely, and (2) he must demonstrate "cause" under § 157.  He fails both requirements.

**A.     The Motion Is Untimely**

While there is no specific time limit for motions under 28 U.S.C. § 157(d), "[i]n this Circuit . . . courts have defined 'timely' to mean 'as soon as possible after the moving party has notice of the grounds for withdrawing the reference.'" *Official Comm. of Unsecured Creditors of FMI Forwarding Co. v. Union Transp. Corp. (In re FMI Forwarding Co.)*, No. 04 Civ. 630, 2005 WL 147298, at *6 (S.D.N.Y. Jan.24, 2005); *see also Kentile Floors v. Congoleum Corp. (In re Kentile Floors )*, Adv. No. 94-8518A, No. 95 Civ. 2470, 1995 WL 479512, at *2 (S.D.N.Y. Aug.10, 1995)*.* Courts have additionally described the timeliness requirement as demanding the movant bring the motion at "the first reasonable opportunity." *In re Chateaugay Corp.*, 104 B.R. 622, 624 (S.D.N.Y. 1989).  This timeliness requirement is fatal to Defendant's motion.

Every fact and document Defendant relies on for his argument to withdraw the reference was available and indeed known to him at the outset of this Adversary Proceeding in September of last year and certainly no later than when he answered the Adversary Complaint on October 20, 2023. Yet for months he waited, electing to bring this motion only when faced with the prospect of his deposition—perhaps anticipating that his testimony would significantly undercut his only defense.

Defendant combination of his motion to compel arbitration with the motion to withdraw the reference further reveals his delay tactics. Like his arguments to withdraw the reference, Defendant's arbitration motion is predicated entirely on a document he first produced in discovery in November 2023, which documents he was aware of long before this lawsuit was even filed (as confirmed in his deposition testimony). Silberstein Dep. 121–123. Yet he waited until the advent of his deposition before launching this bevy of attacks on the forum for this lawsuit. Defendant offers no explanation for the months during which he sat on his hands, and the Court should see this for what it is—an attempt to artificially extend these proceedings as long as he can.

But the law does not permit him to wait until he finds the most strategically advantageous time to disrupt the proceedings. In fact, the timeliness requirement is *specifically* meant to guard against delay tactics such as those Defendant employs here. *In re FMI Forwarding Co., Inc.*, 2005 WL 147298, at *6. Accordingly, the Court should not hesitate to enforce that requirement and deny the motion. However, even if the Court were to entertain the untimely Motion, it would still fail on the merits.

### B.      Cause Does Not Exist to Withdraw the Reference

The Second Circuit has adopted a two-prong test to determine whether "cause" exists to withdraw the reference to the Bankruptcy Court. The inquiry, often referred to as the *Orion* test, is aimed at questions of judicial economy and uniformity in bankruptcy administration. *In re*

*Orion Pictures Corp.*, 4 F.3d 1095, 1101 (2d Cir. 1993).   Under the test, "a district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core" and then proceed to "weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other factors. *In re Orion Pictures Corp. See* 4 F.3d 1095, 1101 (2d Cir. 1993); *see also In re Residential Cap., LLC*, 527 B.R. 865, 871 (S.D.N.Y. 2014) (quoting *Orion*).

The court begins with the core/non-core distinction because it is a helpful starting point in determining whether it is practical and prudent for the Bankruptcy Court to adjudicate the matter as opposed to a District Court that may be less familiar with the facts and context of the bankruptcy proceeding.  However, the core/non-core question is the beginning, not the end, of the inquiry. The issues of judicial economy and uniformity of administration are paramount, and must always guide the District Court's judgment on § 157 motions.  Hence the inclusion of the additional *Orion* factors, which can and often do mitigate in favor of keeping a proceeding with the Bankruptcy Court even when it concerns non-core claims.

### i.    *Core Claims Are Likely to be Introduced into the Adversary Proceeding Following Deposition Testimony*

At the time of this filing, the sole claim in the adversary proceeding is for breach of contract based on a pre-petition obligation under the Note.  Thus, Plaintiff's claim, as it currently stands, is likely non-core.  *Orion*, 4 F.3d at 1102.  However, following Defendant's deposition testimony on February 19, 2024, Plaintiff moved the Bankruptcy Court to extend the deadline to file a motion to amend its Adversary Complaint, which request was granted.  Adv. Pro. ECF Nos. 17–18.  As Plaintiff previewed for the Court in its letter motion, Defendant's deposition testimony implicated, for the first time, additional claims for fraudulent transfers under 11 U.S.C. § 548 related to both the Note and the "release" Defendant has offered up as his only defense to Plaintiff's claim.  Adv. Pro. ECF No. 17.

Specifically, Defendant testified that he and Mr. Goldman, then the sole shareholder and manager of the Debtor, engineered a fraud by which Defendant would execute the Note with a shared understanding that Defendant would never actually repay the obligation. Instead, according to the Defendant, it was a "technical note," *i.e.*, a way of Goldman funneling money to Defendant for repayment of obligations Goldman owed Defendant that appear to pre-date the Debtor's corporate existence. Silberstein Dep. 76–79. That testimony further calls into question the nature of the "release" in the October 2020 Agreement that Defendant now holds up as his primary defense. If the Note was a fraud then the "release" would be a continuation of that fraud, *i.e.*, a "papering over" of Defendant and Goldman's true plan. This is especially important because the "release" was executed a mere month before the Debtor announced it was defaulting on $800 million of obligations under its corporate bonds. In other words, according to Defendant's testimony, he was "released" on a multi million-dollar obligation to the Debtor on a facially valid promissory note at a time when the Debtor was grossly insolvent and weeks away from the Debtor's creditors knocking on its door.

In light of this testimony, Plaintiff sought an extension of discovery to depose Mr. Goldman on these matters, which was granted. Adv. Pro. ECF No. 18. Plaintiff anticipates filing a motion to amend its Complaint to include, at a minimum, fraudulent transfer claims under § 548 for both intentional and constructive fraudulent transfer regarding the Note and the "release." Silvestri Decl. ¶ 12. Indeed, depending on the timing of this Court's hearing and decision on the Motion, Plaintiff may have already amended its Complaint to include these claims. Of course, these fraudulent transfer claims are core matters as they would not exist but for the bankruptcy case. 28 U.S.C. § 157(b)(2)(H) (listing "proceedings to determine, avoid, or recover fraudulent conveyances" as core proceedings); *see also In re Try The World, Inc.*, No. 18-11764-JLG, 2021 WL 3502607, at *11 (Bankr. S.D.N.Y. Aug. 9, 2021); *O'Neill v. New England Rd., Inc.*, No.

3:99MC309(SRU), 2000 WL 435507, at *4 (D. Conn. Feb. 28, 2000) ("The current Adversary Proceeding centers around alleged fraudulent conveyances, and as such, is a core proceeding.").

As this Court and others have explained, the core/non-core distinction is not dispositive and is rather in service of the overall inquiry about judicial economy and uniformity of bankruptcy administration. Despite the fact that one of Plaintiff's claims may be non-core, that does not mitigate in favor of dislodging the Bankruptcy Court, whose extensive experience with the Debtor and its stakeholders, such as Mr. Goldman, makes it well-suited to administering the Adversary Proceeding swiftly and efficiently. This is doubly true in light of the imminent and decisively core fraudulent transfer claims, which the Bankruptcy Court would be equally, if not more, well-suited to adjudicate.

This analysis is unaltered even if the Bankruptcy Court would lack the final adjudicatory authority. *See Stern v. Marshall*, 564 U.S. 462 (2011); *In re Money Centers of Am. Inc.*, 579 B.R. 710 713 (S.D.N.Y. 2016) ("When a matter is non-core, and absent the consent of the parties, a bankruptcy judge must issue proposed findings of fact and conclusions of law that are reviewed de novo by the district court."). Any difficulties added by additional procedural step of the Bankruptcy Court submitting findings of fact and conclusions of law is outweighed against the advantages and efficiencies inherent in keeping this matter with a Bankruptcy Court that is intimately familiar with the history of the Debtor's operations, the design and implementation of the Plan, and the identity and conduct of the stakeholders. *See, e.g.*, *Kramer v. Mahia*, No. 12-MC-794 DLI, 2013 WL 1629254, at *5 (E.D.N.Y. Apr. 15, 2013) ("[I]t would be more efficient for the Bankruptcy Court to propose findings of fact and conclusions of law in the first instance than withdraw the reference at this stage."); *Pryor v. Tromba*, No. 13-CV-676 JFB, 2014 WL 1355623, at *7 (E.D.N.Y. Apr. 7, 2014) (same). Nor does the presence of a jury demand require withdrawal of the reference. As the Eastern District of New York has explained "[a] motion for

withdrawal of the reference will not be granted simply because of a party's demand for a jury trial, without consideration of how far the litigation has progressed, because such decision would run counter to the court's interest in judicial economy. *Id.* at *8 (citing *In re Extended Stay, Inc.*, 466 B.R. 188, 198 (S.D.N.Y. 2011)). Rather, the inquiry remains steadfastly fixed on judicial efficiency and courts have determined that a jury demand may be outweighed by factors such as "a bankruptcy court's familiarity with the litigation, whether the bankruptcy court will offer a swift resolution of the issues." *In re Extended Stay, Inc.*, 466 B.R. 188, 198 (S.D.N.Y. 2011). Accordingly, the judicial inquiry into the nature of the proceedings as core or non-core nonetheless favors denying Defendant's Motion.

### ii.      The Other Orion Factors Weigh in Favor of Keeping This Adversary Proceeding with the Bankruptcy Court

The second prong of the *Orion* test instructs district courts considering a motion to withdraw the reference to "weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion*, 4 F.3d at 1101. These factors weigh in favor of the reference remaining with the Bankruptcy Court.

First, the efficient use of judicial resources would be to keep this Adversary Proceeding in the Bankruptcy Court. The Debtor's bankruptcy case has been before Chief Judge Glenn for more than two years. The Bankruptcy Court has overseen all of the Plaintiff's post-confirmation actions to bring additional resources into the estate and to gather information about potential claims. Chief Judge Glenn has important knowledge of the Debtor and its prepetition dealings, including those of its former sole shareholder, Mr. Goldman, whose conduct is now fully implicated in this Adversary Proceeding. Indeed, this Court has previously declined to withdraw the reference and preferred to keep claims before Chief Judge Glenn because of his "expertise and extensive

familiarity" with a debtor's plan.  *See In re Residential Cap.*, LLC, 519 B.R. 593, 603 (S.D.N.Y. 2014).

Second, the parties will not be delayed or incur additional costs if this matter remains in Bankruptcy Court.  Over the course of the Debtor's chapter 11 case, the vast majority of hearings have been conducted via Zoom for Government, which has saved all interested parties both time and travel expense.  Though Defendant demanded a jury trial in its Answer, discovery suggests that his matter that can be decided by the Bankruptcy Court through dispositive motions aimed at the purely legal question of whether the "release" is ineffective to block Defendant's otherwise clear liability.  In such a case the Second Circuit has recognized that the Bankruptcy Court is the appropriate forum.  *See Orion*, 4 F.3d at 1101–02. ("A district court also might decide that a case is unlikely to reach trial, that it will require protracted discovery and court oversight before trial, or that the jury demand is without merit, and therefore might conclude that the case at that time is best left in the bankruptcy court.").

Conversely, there is likely to be substantial delay and additional cost if this matter is adjudicated in the District Court.  Chief Judge Glenn is already well-versed in the history of this case and with the various stakeholders of this bankruptcy proceeding, including especially Mr. Goldman.  Given the recent developments in this case that concern Mr. Goldman, his prepetition activities and conduct, as well as the imminent fraudulent transfer claims concerning the Note and "release," the District Court would need significant time to familiarize itself with the Debtor's business, Mr. Goldman's dealings with commercial partners such as the Defendant, the Debtor's descent into insolvency and the various bonds and debt instruments, and the nature and history of the Debtor's real estate operations, which are complex and involve sophisticated commercial business structures and financial transactions. Those facts and historical context take on additional importance in light of the imminent fraudulent transfer claims.

Third, denying Defendant's Motion promotes uniform bankruptcy administration.  As the post-confirmation successor to certain of the Debtor's claims and causes of action, Plaintiff has brought another adversary proceeding with an identical promissory note claim and pursued Rule 2004 examinations regarding other potential claims in the Bankruptcy Court.  *See AYH Wind Down LLC. v. Alexander Engelman*, Case No. 23-AP-01196 (B.K. S.D.N.Y.). Defendant is not being treated differently than any other party in this post-confirmation phase of the Debtor's chapter 11 case.

Fourth, contrary to its assertions in the Motion, and as explained above in Section I concerning the timeliness of this Motion, Defendant is the only party engaged in forum shopping and seeking delay.  *See, e.g., N. Boulevard Automall*, 2022 WL 5184729, at *3 (E.D.N.Y. Oct. 5, 2022) ("The Third-Party Plaintiffs did not seek to withdraw the reference before answering the Trustee's complaint . . . they waited until after receiving the Third-Party Defendants' motions to dismiss").  Defendant waited months after answering the Adversary Complaint to seek to withdraw the reference and only did so following Plaintiff's repeated requests to schedule his deposition. As explained earlier in this brief, for this reason the Motion is untimely and should be denied solely because it reflects an attempt to delay these proceedings. In any event, Defendant offers no reason to believe that Plaintiff is engaged in forum shopping by bringing claims rightfully reserved and vested under the Plan in the Bankruptcy Court administering that Plan as it has done with similarly situated adversary proceedings.  *See AYH Wind Down LLC. v. Alexander Engelman*, Case No. 23-AP-01196 (B.K. S.D.N.Y.).

Accordingly, despite the non-core nature of the breach of contract claim, the *Orion* factors weigh in favor of denying Defendant's Motion to Withdraw the Reference.  In addition to being impermissibly untimely, the Motion fails to offer sufficient reason to believe that the District

Court, which is unfamiliar with the history, facts, and stakeholders of a complex and lengthy bankruptcy proceeding, would be able to administer this proceeding more efficiently.

## II.   DEFENDANT'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED

Defendant further seeks an order compelling arbitration before a Rabbinical Court.  As a threshold matter, if this Court denies the Motion to Withdraw the Reference, it should not reach the question of arbitration, and instead remand Defendant's motion to the Bankruptcy Court where it should have been filed in the first place.  However, even if the Court were to grant the Motion to Withdraw the Reference  and entertain the Motion to Compel Arbitration, that motion still fails.

A motion to compel arbitration is similar to a motion for summary judgment in that there must be no question of material fact that: (1) the dispute falls within the scope of the arbitration agreement, and (2) the arbitration agreement is valid and enforceable.  *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21CV10377ATKHP, 2022 WL 987665, at *3 (S.D.N.Y. Apr. 1, 2022).  As the movant, Defendant bears the initial burden in that regard.  *Id.*  Furthermore, it is well-settled under New York law that arbitration will not be compelled absent the parties' clear, explicit and unequivocal agreement to arbitrate. *Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7-8 (2d Cir. 2009).  Finally, a party may nonetheless waive their right to compel arbitration through litigation conduct, such as participating in the lawsuit.  *GateGuard, Inc. v. Goldenberg*, 585 F. Supp. 3d 391, 396 (S.D.N.Y. 2022).

### A.   The 2015 Agreement's Arbitration Clause Does Not Apply to the Adversary Proceeding

Defendant concedes that for this Court to enforce the arbitration agreement there must be no question of material fact that the arbitration agreement applies to the instant dispute.  *See* Motion p. 13 (citing *Whitehaven S.F., LLC v. Spangler*, 633 F. App'x 544, 545–46 (2d Cir. 2015). Defendant's Motion fails meet this initial burden.

It is clear from the plain language of the arbitration agreement that this Adversary Proceeding, which concerns a later-arising promissory note, does not fall within the arbitration agreement's limited scope.  By its terms there are three categories of disputes the arbitration agreement applies to: (1) disputes that "concern this agreement," (2) disputes that "concern[] any of the four properties mentioned above," and (3) any other matter that "both parties agree as to being derived from the above properties."  Aloe Decl. Exhibit N, ECF No. 3-1 at p. 234–35. Defendant avers that this is "broad" language, and that the arbitration agreement applies to "any and all disputes arising out of the parties" but the arbitration agreement completely undermines that position.  It is clear that Defendant and Goldman only ever intended this arbitration agreement to apply to a closed universe of disputes concerning the real estate development projects they were at the time actively engaged in. The only respect in which this arbitration agreement is "broad" is that it is meant to capture any such dispute *concerning those properties*, which are 41-21 28th Street", "The North Flats" "Albee Square" and "19 Kent."  ECF No. 3-1 at p. 229–230.

Defendant confirmed the 2015 Agreement's specific focus on those real estate properties multiple times during his deposition:

> A:  [The 2015 Agreement] was an agreement on the three big ones. We had, like, this is project that I supposed to get equity percentage, which I was looking out to, and I want to have it documented because I don't know what tomorrow will bring.
>
> . . .
>
> Question:  Why were you asking for something in writing?
>
> Answer:  Because talking here about quite a few transactions, and it was a big party of my life at that time, these transactions, and I was putting a lot of work in it.

Silberstein Dep. p. 60, 123.  Additionally, the 2015 Agreement itself confirms over and over again that its scope is limited to these specific development projects.  For example, it walks through, in detail, Defendant's contentions about his work for those projects.  ECF No. 3-1 at p. 229–239 at

paras 1–3 ("[Silberstein] assisted him substantially in this purchase [**of Albee Square**] and accompanied him throughout the entire process"; "For the efforts and exertions of [Silberstein] on behalf of [Goldman] in the development . . . **called North Flats** . . . and for his efforts and exertions in the development located at the address **41-21 28ᵗʰ Street**") (emphasis added).

This dispute concerns a promissory note executed in 2018, three years after the arbitration agreement was signed and six years after the Albee Square, North Flats, and 28ᵗʰ Street projects began.  Silberstein Dep. 190–194.  As to the first category covered by the arbitration agreement, *i.e.* disputes concerning the 2015 Agreement, this Adversary Proceeding is completely unrelated to the 2015 Agreement.  As to the second category, *i.e.*, disputes concerning the Albee Square, North Flats, 28ᵗʰ Street, and Kent properties, the Adversary Proceeding is wholly unrelated to those development projects.  The Note makes no mention of those projects.  The Note was not issued in connection with those projects. The 2015 Agreement makes no mention of disputes related to promissory notes or other monies owed, despite the fact that Defendant testified that he and Goldman regularly moved money between each other, which obligations were never memorialized in writing.  Silberstein Dep. 50–57 ("most of the time it was just . . . by verbal agreements and confirmation between us.").  When asked "how did you keep track of all this money moving around?" Defendant responded :"It was difficult, and it is still difficult and I still can't figure it out."  Silberstein Dep. 56.  Thus, if this 2015 Agreement were intended to reach monetary obligations separate from these real estate projects, such as the Note, the parties could have included language extending the scope of the agreement to those types of obligations.  They could have, for instance, used the "any and all" language contained in Defendant's Motion.  Motion p. 2. But they did not because, as the language of the arbitration agreement reveals, neither of them ever intended to submit any disagreements between the two parties to arbitration.  As to the third

and final category, it is obvious that both parties do not agree that this dispute implicates the 2015 Agreement.

**B.    There Are Questions of Material Fact Surrounding the Formation of the Arbitration Agreement**

Defendant's deposition testimony significantly calls into question whether Plaintiff, as successor-in-interest to the Debtor, is the party bound by the 2015 Agreement.   During his deposition, Defendant testified at length about his dealings with Goldman and consistently made clear that he was under the impression he was dealing with Yoel Goldman personally:

> Question:  In your mind, was Mr. Goldman and all these other entities, some of which are called All Year, were they distinct and separate, or was it all just, kind of, Mr. Goldman?
>
> Answer:  All of them was Mr. Goldman.
>
> Question:  Okay.  So in your mind, you're dealing with Yoel Goldman and that's it?
>
> Answer:  That is correct. . . . for me all of his entities, everything was one person.

Silberstein Dep. p. 65.   This is important because the 2015 Agreement, which contains the arbitration provision, concerns Defendant's real estate dealings that began in 2012 and 2013, *i.e.*, before the Debtor even existed.  Defendant confirmed this in his deposition:

> Question:   [The 2015 Agreement], that document is not a contemporaneous memorialization . . . in other words, it discusses obligations that were owed, for example, back in 2012 or 2013.  Do you understand the distinction I'm making?
>
> Answer:  Yeah.

In order for the arbitration provision in the 2015 Agreement to bind the Debtor it must have been agreed to by the Debtor in the first place.  And while Mr. Goldman in the 2015 Agreement purports to have signed on behalf of himself and various entities, Defendant's testimony, at a minimum, creates factual questions and strongly suggests that the 2015 Agreement was only ever

meant to be between Goldman and Defendant *personally*.  Those factual questions are sufficient to defeat a motion to compel arbitration. *Aminoff & Co. LLC*, 2022 WL 987665, at *3.

Moreover, Defendant confirmed that, even if other corporate entities were implicated in this arbitration agreement, none of them would have been the Debtor, which was not even in existence when the two men started working on these various real estate development projects in 2012 and 2013.  For example, Defendant confirmed that with respect to the Albee Square property it was "Spencer Albee Equities" that would have been the affiliated corporate entity.  Silberstein Dep. 137–138.  So to with the "North Flats" which concerned "North Flats LLC" and 41-21 28th Street Acquisition LLC, which dealt with the property in Long Island City.  *See* Aloe Decl. Ex. N, ECF No. 3-1 at pp. 232.  In fact, except for one instance in one paragraph, the Debtor is simply not mentioned in the 2015 Agreement   This makes sense because, as Defendant repeatedly confirmed, he was only really dealing with Goldman, not the Debtor.

> ### i.      *Defendant Waived His Right to Arbitrate By Sitting on His Rights*

Even if the Court were persuaded that the arbitration agreement applies to the dispute over the Note (which it does not) and that it further binds the Debtor (which it does not), a litigant may waive his right to compel arbitration by failing to bring a timely motion.  A court must look to three factors to determine whether a party has waived its right to compel arbitration by litigation conduct: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010). "Generally, waiver is more likely to be found the longer the litigation goes on, the more a party avails itself of the opportunity to litigate, and the more that party's litigation results in prejudice to the opposing party." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002).  Fundamental to any such waiver is the

notion that the non-movant will be prejudiced by arbitration at the time the motion is filed. *Merrill Lynch*, 626 F.3d at 159.  "There is no rigid formula or bright-line rule for identifying when a party has waived its right to arbitration; rather, the above factors must be applied to the specific context of each particular case." *Merrill Lynch*, 626 F.3d at 159.

First, Defendant waited until the moment he was faced with the prospect of a deposition before moving to compel arbitration, which strongly suggests that this motion is a delay tactic designed precisely to prejudice Plaintiff from prosecuting its rights under the Note.  Defendant knew of the arbitration provision long before the outset of the case and he first disclosed the 2015 Agreement in his Initial Disclosures in November 2023.  Yet he waited months to bring this motion.  The lack of reasonable explanation for the delay, more so than the length of time, mitigates in favor of waiver here.  *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 2018 WL 6618389, at *3 (S.D.N.Y. Dec. 18, 2018) (finding waiver after defendant offered "no reasonable explanation as to why it waited" to seek arbitration); *see also Merrill Lynch*, 626 F.3d at 159-60 (characterizing an eleven-month delay as a "significant amount of time" that, in combination with other factors, constituted waiver); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995) (seven-month delay supported waiver).

Second, Defendant stonewalled in discovery for as long as he could, failing to produce a single document in response to discovery requests or provide dates to schedule his deposition, before filing this motion to compel arbitration.  Had it not been for the Bankruptcy Court ordering Defendant to provide his availability for a deposition on February 7, 2024, Plaintiff might still very well be waiting for that testimony.

Third, Plaintiff will be prejudiced by arbitration before the Rabbinical court of the Hisachdus Harabonim at this point in the litigation.  Not only has Plaintiff expended efforts in discovery, including deposition testimony and the review of documents, but it is unclear to Plaintiff

whether such discovery would even be available in proceedings before a Rabbinical court.  Even if proceedings before the Rabbinical court contemplated the Defendant's testimony, it is unclear whether Plaintiff would be entitled to seek a third-party deposition of Mr. Goldman in such a proceeding (which it is currently doing in the Adversary Proceeding), nor is it clear that Plaintiff could bring its newly emerging claims under the Bankruptcy Code for fraudulent transfer in that same forum.  In fact, it is conceivable that, were this arbitration provision enforced with regard to this dispute, Plaintiff would litigate its breach of contract claim in Rabbinical court while litigating its core bankruptcy claims in a separate forum.  *See, e.g.*, *Johnson v. S.A.I.L. LLC (In re Johnson)*, 649 B.R. 735 (Bankr. N.D. Ill. 2023) (sending non-core claims to arbitration while keeping core claims arising from a proof of claim with the Bankruptcy Court).

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendant's Motion to Withdraw the Reference and Compel Arbitration in its entirety and close this case.

DATED:  March 6, 2024

Respectfully submitted,

CHAPMAN AND CUTLER LLP

By: _____
      Eric Silvestri

David T.B. Audley (admitted *pro hac vice*)
Eric Silvestri (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
320 South Canal
Chicago, Illinois 60606
(312) 845-3000
audley@chapman.com
silvest@chapman.com